**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


TYLER YEWELL GRANT

     v.                                     Civil No. 25-cv-00103-LM-TSM

GRAFTON COUNTY, et al.


<u>**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS**</u>
<u>**AND MOTIONS FOR PRELIMINARY INJUNCTIONS**</u>

Self-represented Plaintiff Tyler Grant filed this fifty-eight count lawsuit, pursuant to 42 U.S.C. §§ 1983 and 1985, against various private, local, and federal actors.[1]  Doc. No. 1.  In general, Mr. Grant alleges that for nearly ten years, he was "consistently electronically and physically monitored by law enforcement" without notice as to why he was the subject of "such an elongated and extensive investigation." Id. at ¶¶ 2, 3.  He further alleges that during that period, Defendants conspired to, *inter alia*, "catfish[] [him] into more than 80 romantic dates," take advantage of his obsessive-compulsive disorder (OCD) in order to manipulate and harass him, and plant devices in his brain for the purpose of controlling his mind and actions.  Id. at ¶¶ 3–4, 7, 26.  Mr. Grant seeks injunctive and declaratory relief, along with damages.  Id. at ¶ 1.

Presently before the court for a report and recommendation are Defendants' motions to dismiss, in which Defendants move to dismiss some or all of Mr. Grant's claims against them

---

[1] Mr. Grant named the Sheriff of Grafton County, Jillian Myers, Grafton County, and 1–250 unnamed employees of Grafton County as defendants.  However, Mr. Grant voluntarily dismissed those defendants from the case.  See Doc. No. 55; Endorsed Order, Jul. 28, 2025.

(Doc. Nos. 36, 37, 38, 40, 42).[2] See 28 U.S.C. 636(b)(1)(B). Mr. Grant's motions for preliminary injunctions have also been referred for a report and recommendation (Doc. Nos. 5, 6). For the reasons that follow, the court recommends that the district judge grant Defendants' motions to dismiss in full and deny Mr. Grant's motions for preliminary injunctions.

## BACKGROUND

### *Parties*

Mr. Grant is a "40 year old investment professional, graduate of the Tuck School of Business at Dartmouth College, and former resident of Grafton County." Doc. No. 1 at ¶ 1. Mr. Grant states that he has a "mental disorder," OCD, which manifests in him having a "regimented routine," and "excellent awareness of patterns and numbers, hypervigilance and extreme concern for others' wellbeing[.]" Id. at ¶ 7.

Mr. Grant sued three federal officials, all in their individual capacity. Id. at ¶¶ 39–41. The federal actors include: 1) former United States Attorney General Merrick Garland; 2) Christopher, Wray, the former Director of the Federal Bureau of Investigation; and 3) former Deputy Director of the FBI, Paul Abbate. Id. Mr. Grant alleges that these federal actors were "policy maker[s] and or supervisor[s]" who "act[ed] under color of law within the course and scope of [their] prior employment[.]" Id. In addition to the individual federal actors, Mr. Grant includes as Defendants 1–250 John Doe FBI individuals ("FBI Does") who he alleges were "provided with federal authority and acting under color of law . . . in their individual capacities." Id. at ¶¶ 1, 53. Garland, Wray, Abbate, and the FBI Does are collectively referred to as the Federal Defendants.

---

[2] Officer Fowler, who was sued in his individual and official capacities, is the only Defendant who moved to partially dismiss the claims against him. He only moves to dismiss the official-capacity claims against him. Doc. No. 38.

Mr. Grant also sued several local entities and private actors from the Town of Hanover, the Town of Lebanon, and Dartmouth Hitchcock Medical Center.[3]  Mr. Grant sued the Town of Hanover, NH, the Hanover Police Department ("HPD"), and two HPD officers in their official and individual capacities: the former Chief, Charlie Dennis, and Officer Daniel Fowler.  Id. at ¶¶ 1, 43, 45, 47.  Mr. Grant alleges that Chief Dennis was a "policy maker and or supervisor" who "act[ed] under color of law within the course and scope of his prior employment" as Chief of the HPD, id. at ¶ 43, and that Officer Fowler "act[ed] under color of law within the course and scope of his employment . . . as a law enforcement officer of the HPD."  Id. at ¶ 45.  As to his claims against Hanover, Mr. Grant alleges that the Town is a "governmental entity" that "is, or was, the employer of . . . individually named Defendants[,] including, but not limited to, those who are sued in their individual and official capacities, as well as one, or all, of . . . D[oes] 1 through 250[]" ("HPD Does").  Id. at ¶ 47.  Mr. Grant alleges that the identities "and/or . . . nature of involvement of" HPD Does is currently unknown, but "alleges that there is likely to be evidentiary support to prove" that the HPD Does were "involved in some manner and legally responsible for the acts, omissions and/or breaches of duty alleged" in the Complaint.  Id. at ¶ 50.  The Town of Hanover, its police department, Chief Dennis, and the HPD Does are collectively referred to as the "Hanover Defendants."[4]  Id. at ¶ 47.

---

[3] In his Complaint, Mr. Grant named Dartmouth Hitchcock Hospital as a defendant.  Doc. No. 1. However, that Defendant's proper name is Dartmouth Hitchcock Medical Center ("DHMC"). Doc. No. 40-1 at pg. 1.

[4] Although Officer Fowler is employed by the HPD/the Town of Hanover, Officer Fowler moves to dismiss the claims against him separately from the other Hanover Defendants.  Doc. No. 38. Accordingly, the court will not include him in the "Hanover Defendants" for purposes of this Report and Recommendation.

From the Town of Lebanon, NH, Mr. Grant sued the Town, the Lebanon Police Department ("LPD"), and LPD Chief Phillip Roberts, in his individual and official capacity. Id. at ¶¶ 1, 44, 48. Mr. Grant alleges that Chief Roberts was a "policy maker and or supervisor" who "act[ed] under color of law within the course and scope of his employment" as the Chief of the LPD. Id. at ¶ 44. Mr. Grant also sued the Town of Lebanon as a "governmental entity" that "is, or was, the employer of . . . individually named Defendants[,] including, but not limited to, those who are sued in their individual and official capacities, as well as one, or all, of . . . D[oes] 1 through 250[]" ("LPD Does"). Id. at ¶ 48. Mr. Grant alleges that the identities "and/or . . . nature of involvement of" LPD Does is currently unknown, but "alleges that there is likely to be evidentiary support to prove" that the LPD Does were "involved in some manner and legally responsible for the acts, omissions and/or breaches of duty alleged" in the Complaint. Id. at ¶ 50. The Town of Lebanon, the LPD, Chief Roberts, and the LPD Does are referred to as the "Lebanon Defendants."

Mr. Grant also sued DHMC as a hospital and "duly constituted entity" that "is, or was, the employer of those provided with state power of state authority," including "individually named Defendants . . . who are sued in their individual and official capacities, as well as one, or all, of Defendant D[oes] [DHMC] 1 through 250" ("DHMC Does") (collectively, "DHMC Defendants"). Id. at ¶ 49.

Finally, Mr. Grant includes John Doe Defendants 1–250 ("John Doe Defendants"). Id. at ¶¶ 1, 50. He states that the "identities, capacities, and/or nature of involvement of Defendant Does are presently unknown to [him]," but he "believes . . . there is likely to be evidentiary support to prove that each Doe Defendant was involved in some manner and legally responsible for the acts, omissions and/or breaches of duty alleged" in his lawsuit. Id.

### *The Investigation of Mr. Grant*

Mr. Grant states that "a broad group" of law enforcement officials, including but not limited to Defendants, began investigating him as early as 2016, when he lived in Boston, MA. Id. at ¶¶ 2, 58. Mr. Grant states that he "has never been informed by law enforcement of allegations that would warrant such an elongated and extensive investigation." Id. at ¶ 3. Yet, for the past nine years, he has been "consistently electronically and physically monitored by law enforcement, including within the privacy of his home." Id. at ¶¶ 2–3.

Mr. Grant alleges that since he has been under investigation, he "has been the victim of a persecution of hundreds of sting operations." Id. at ¶ 4. As part of the "sting operations," Mr. Grant alleges that "he has been catfished into more than 80 romantic dates with greater than 20 women of appropriate age acting undercover in an investigative capacity."[5] Id. When those sting operations failed, Mr. Grant alleges that law enforcement tried to set him "up in white-collar crimes — such as mortgage fraud, mail fraud, and identity fraud — and a long list of other common crimes." Id. Mr. Grant alleges that the "continuous onslaught of sting operations" "evolved into targeted harassment" and "has greatly curtailed [his] liberty and the pursuit of happiness without due process of law." Id. at ¶¶ 4, 5.

### *Sting Operation Involving Mr. Grant's Neighbors (July 2020)*

In October of 2019, Mr. Grant purchased a home in Hanover. Id. at ¶ 8. He alleges that, following his move, the catfishing continued as part of the "larger investigation" against him. Id. Mr. Grant further alleges that in July of 2020, he had an interaction with one of his neighbor's

---

[5] "Catfishing" refers to the act of deceiving someone "by creating a false personal profile online[.]" Catfishing, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/catfish#h1 (last visited Feb. 24, 2026).

college-aged daughters, where she "without any antagonization yelled at" him and told "him to go back to where he came from." Id. at ¶ 9. Mr. Grant states that although he did not respond and went into his house, the FBI, HPD, and DHMC Does, as well as the John Doe Defendants, began conspiring with his neighbors against him. Id. Mr. Grant alleges that these Defendants used his neighbors over the next four years to conduct sting operations against him. Id. He claims that Defendants would position his neighbors' daughters along "predictable routes in hopes that [Mr. Grant] would retaliate against them. Id. at ¶ 83.

### Sting Operation Involving Small Child (December 2020)

On December 21, 2020, when Mr. Grant was "performing a predictable daily driving commute," he came upon "a small child of approximately eight to twelve years of age sitting alone curled up in a ball and completely still" on the side of the road. Id. at ¶¶ 89–90. Although Mr. Grant was concerned for the child because it was "below freezing" and there was about two feet of snow on the ground, he continued driving. Id. at ¶¶ 88, 90–91. As he continued his drive, he came across a Black Lives Matter rally, which triggered him, so he returned to check on the child. Id. ¶¶ 92–94. After confirming the child was okay, Mr. Grant continued with his daily drive. Id. at ¶ 95.

Mr. Grant claims that the FBI Does, HPD Does, and John Does Defendants "took advantage of his OCD tendencies to entrap him" by intentionally placing a child on the side of the road on a cold day in the hopes that Mr. Grant would stop and check on the child. Id. at ¶ 93. Mr. Grant alleges that the FBI Does, HPD Does, and John Does Defendants used this incident to spread defamatory information about Mr. Grant by suggesting he is a danger to children. Id. at ¶¶ 87, 93–96.

6

***Defendants Allegedly Drug Mr. Grant's Coffee (December 2020)***

Mr. Grant alleges that sometime after the December 21, 2020 sting operation involving the small child, the FBI Does conspired with the John Doe Defendants to drug his Dunkin' Donuts coffee. Id. at ¶ 101. He alleges that on multiple occasions, he became relaxed while drinking his coffee. Id. Mr. Grant further alleges that on one occasion while drinking his beverage through a straw, a pill entered his mouth. Id. Mr. Grant claims these events are consistent with Defendants' ongoing investigation of him and their numerous sting operations.

***Law Enforcement Harasses Mr. Grant's***
***Emotional Support Animal (March 2022)***

Starting on March 1, 2022, Mr. Grant states that "broader law enforcement," including the FBI Does, HPD Does, and John Doe Defendants, began using devices that emitted a high-frequency noise that is not audible to humans, but was heard by Mr. Grant's emotional support dog and caused the dog to bark. Id. at ¶¶ 103, 105. Mr. Grant alleges that Defendants used the noise-emitting device "as part of a more complex sting operation," to "try to disrupt Mr. Grant's mood . . . heading into the sting operation in the hopes that he [would] lash[] out." Id. at ¶ 106. Mr. Grant claims these devices were used to harass him and his dog until he moved out of Hanover.[6] Id. at ¶ 107.

***Mr. Grant Reports Shooting Attempt (February 2023)***

At the end of February 2023, Mr. Grant alleges that he was driving on the highway when two items struck his vehicle's windshield, causing a loud noise. Id. at ¶¶ 109–10. Mr. Grant believes his windshield was shot with a firearm and, although he reported it to the HPD, he never received a response. Id. at ¶¶ 110–12. Mr. Grant followed up with the HPD about his windshield

---

[6] Although Mr. Grant does not specify when he moved out of Hanover, he appears to have moved at least by the time he filed his Complaint in March 2025 because he used a South Dakota address.

in June 2023 and was told by someone at HPD that there was no record of Mr. Grant's February 2023 call and that no action had been taken on Mr. Grant's claim. Id. at ¶ 113. In the weeks following his June 2023 call to HPD, Mr. Grant felt that he had been given drugs, specifically "some kind of agitator," in his Dunkin' Donuts coffee again. Id. at ¶ 115.

### Mr. Grant's False Arrest (June 27, 2023)

Later in June 2023, after Mr. Grant's follow-up call to HPD, Mr. Grant claims that "he was more actively targeted by law enforcement." Id. at ¶ 116. He alleges that on June 27, 2023, Officer Fowler unlawfully "detained" him and subsequently arrested him for disorderly conduct. Id. at ¶ 117. On that day, Mr. Grant parked his vehicle in a designated parking spot near 14 North Main Street in Hanover, turned on his vehicle's hazard lights, and then, using the crosswalk, crossed the street to take pictures of his surrounding area, all without incident. Id. at ¶¶ 117–18. Then, Officer Fowler drove his police cruiser onto the sidewalk, exited the cruiser, and "immediately unlawfully detained, battered, searched and arrested" Mr. Grant. Id. at ¶ 119. Mr. Grant claims that Officer Fowler lacked any legal basis for the arrest and used excessive force while placing handcuffs on him, during which time Officer Fowler attempted to knock Mr. Grant to the ground and caused Mr. Grant's upper thigh to bruise. Id. at ¶¶ 117, 122. The criminal case against Mr. Grant was ultimately dismissed, but, according to Mr. Grant, Officer Fowler wrote a false police report about his reason for arresting Mr. Grant. Id. at ¶¶ 120–21. Mr. Grant alleges that he experienced post-traumatic stress disorder because of the arrest. Id. at ¶ 122.

### Mr. Grant's Involuntary Commitment to DHMC (June 28, 2023)

The next day, on June 28, 2023, Mr. Grant was involuntarily committed to DHMC "under court order." Id. at ¶ 125. Mr. Grant believes he was admitted because of his disorderly conduct charge; a false allegation that he threatened to burn down the house of Dartmouth's President; and

a general "retaliatory animus" toward him on behalf of the FBI Does, HPD Does, and John Doe Defendants for the ongoing investigation against him and for his report that his windshield had been shot by a firearm. Id. at ¶¶ 125–27. Upon arriving at DHMC for his involuntary commitment, Mr. Grant alleges that his constitutional rights were further violated when HPD Does, LPD Does, DHMC Does, and John Doe Defendants denied Mr. Grant the opportunity to call a lawyer to be present while individuals at DHMC interrogated him. Id. at ¶¶ 128, 332, 339. The next day and sometime before his court hearing, Mr. Grant was able to speak with a lawyer, but he alleges that he did not receive effective assistance of counsel due to time constraints. Id. at ¶ 129. Mr. Grant was not permitted to attend that hearing in person but instead participated by phone. Id. at ¶ 130.

Regarding the conditions of his involuntary commitment, Mr. Grant alleges that DHMC Does failed to meet certain showering and clothing needs that would have helped manage his OCD condition. Id. at ¶ 132. While at the hospital, Mr. Grant expressed his displeasure that his OCD condition was not properly treated and claims that he was strapped to his hospital bed because he expressed those beliefs. Id. at ¶ 133. Then, according to Mr. Grant, within minutes of being tied to the hospital bed, he was injected with an unknown substance that caused him to sleep. Id. at ¶ 134. The next day, Mr. Grant woke up in a different bed. Id. at ¶ 135.

Mr. Grant alleges that, while he was sedated, the FBI Does, HPD Does, LPD Does, DHMC Does, and John Doe Defendants conspired to and did install electronic medical devices in Mr. Grant's body, without his consent or knowledge, including a nerve and brain stimulator and a brain-computer neural interface that can be controlled remotely by the FBI and the John Doe Defendants. Id. at ¶¶ 137, 368, 376, 384, 389, 396, 403, 410, 417. Mr. Grant alleges that those devices are used in conjunction with ongoing sting operations and as a way to torture him by causing electronic shocks throughout his body and/or to his brain, which result in Mr. Grant feeling

dizzy, nauseous, or generally unwell; losing speech; or experiencing unfavorable moods.  Id. at ¶¶ 138–39.

### Sting Operations During Mr. Grant's Involuntary Commitment (July 2023)

In July 2023, while involuntarily committed at DHMC, Mr. Grant states he was subjected to two more sting operation instances.  See id. at ¶¶ 145–53.  First, on July 2, 2023, FBI Does, HPD Does, LPD Does, DHMC Does, and John Doe Defendants conspired to place a nurse with an alias name of "Coco" on his unit.  Id. at ¶¶ 145, 422, 427, 434, 441.  Nurse "Coco" had the same first name as a woman who was previously part of a sting operation date with Mr. Grant in Boston.  Id. at ¶ 146.  Mr. Grant states that nurse Coco was put on his floor "with the hope of antagonizing and coercing him into negative behavior that could be prosecuted."  Id.

Mr. Grant alleges that, in early July 2023, FBI Does, HPD Does, LPD Does, DHMC Does, and John Doe Defendants conducted a second sting operation.  Id. at ¶ 150.  He claims that these Defendants conspired to place a small black child under a blanket in the middle of his hospital floor with the intention of using the child to antagonize and coerce Mr. Grant.  Id. at ¶¶ 150–51, 446, 451, 458, 465.  As Mr. Grant walked past the child, he claims that the child would lift the blanket and taunt him.  Id. at ¶ 151.

### Altered Patient Stay Notes and HPD Police Reports

Mr. Grant alleges that at some point after his involuntary commitment in June and July of 2023, FBI Does, HPD Does, LPD Does, DHMC Does, and John Doe Defendants "have continuously rewritten, revised, falsified, and modified" his patient stay notes to make Mr. Grant "appear in a significantly more negative light" and to protect Defendants' legal interests.  Id. at ¶ 154.  Mr. Grant further alleges that law enforcement monitored his electronics while he prepared

for the instant litigation, and then altered the patient stay notes in anticipation of litigation. See id. at ¶ 158.

Mr. Grant also claims that FBI Does, HPD Does, and John Doe Defendants altered police reports to portray Mr. Grant in a negative light and protect Defendants' legal interests. Id. at ¶ 160. He further states that FBI Does and HPD Does "monitored" his electronic devices in preparation for this lawsuit. Id.

### The Lawsuit and Defendants' Motions to Dismiss

Mr. Grant filed the instant lawsuit on March 11, 2025. In his fifty-eight count Complaint, he generally alleges: (1) violations of his constitutional rights pursuant to 42 U.S.C. § 1983; (2) Bivens claims; (3) 42 U.S.C. §§ 1983 and 1985 conspiracy claims; and (4) that his rights were violated by certain Defendants' official polices and/or customs or by those Defendants' failure to train. See generally Doc. No. 1.

All Defendants move to dismiss claims pursuant to Federal Rule of Civil Procedure Rule 12(b)(6). See Doc. Nos. 36, 37, 38, 40, 42. Federal Defendants and DHMC Defendants also move to dismiss the claims against them for lack of subject matter jurisdiction under Rule 12(b)(1). Doc. Nos. 40, 42. Federal Defendants also move to dismiss under Rule 12(b)(2) for lack of personal jurisdiction. Doc. No. 42. Mr. Grant objects to Defendants' motions. Doc. Nos. 45, 56, 58, and 59.[7]

### Requests for Preliminary Injunctive Relief

Mr. Grant requests that the court enjoin Defendants from continuing to use the medical device implanted in his brain to shock and stimulate his brain, which, he claims, results in him feeling dizzy and nauseous, and makes him lose his speech abilities. Doc. No. 5 at ¶ 15, pg. 9.

---

[7] Mr. Grant did not object to Officer Fowler's Motion to Dismiss. Doc. No. 38.

Mr. Grant also asks the court to enjoin Defendants from continuing the "onslaught of sting operations" and criminal investigations against him that includes monitoring Mr. Grant's electronic devices, using foreign substances against Mr. Grant, informing others that Mr. Grant is dangerous, and antagonizing Mr. Grant's OCD condition.  Doc. No. 6 at ¶ 4, pg. 9.  Defendants object to both preliminary injunction motions.  Doc. Nos. 43, 51; see Doc. Nos. 47, 52 (joining Doc. No. 43).

## DISCUSSION

I. **Motion to Dismiss for Lack of Subject Matter Jurisdiction (Claims 1–20, 32–47)**[8]

A.  Standard of Review

When evaluating motions under Fed. R. Civ. P. 12(b)(1), the court assumes the truth of "all well-pleaded facts" and draws "all reasonable inferences therefrom in the plaintiff['s] favor." Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009) (analyzing case under Rule 12(b)(1)). "Because federal courts are courts of limited jurisdiction, federal jurisdiction is never presumed." Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998).  The party asserting federal jurisdiction has the burden of demonstrating its existence.  Id.  Dismissal under Rule 12(b)(1) at the pleading stage is appropriate only when the facts alleged in the complaint, taken as true, do not support a finding of federal subject-matter jurisdiction.  Fothergill, 566 F.3d at 251. A challenge to the

---

[8] Although only the Federal Defendants and the DHMC Defendants move to dismiss under Rule 12(b)(1) (Doc. No. 40-1 at pgs. 6–8; Doc. No. 42-1 at pgs. 3–6), the determination of subject-matter jurisdiction is a threshold matter that the court should consider before proceeding to the merits of the case.  See Efreom v. McKee, 46 F.4th 9, 16 (1st Cir. 2022) (describing determination of subject matter jurisdiction as "threshold matter") (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998)); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

court's subject-matter jurisdiction under Rule 12(b)(1) must be addressed before addressing the merits of a case. Acosta-Ramírez v. Banco Popular de Puerto Rico, 712 F.3d 14, 18 (1st Cir. 2013).

### B. Analysis

"A patently insubstantial" complaint may be dismissed for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1). Neitzke v. Williams, 490 U.S. 319, 327 n.6 (1989) (citing Hagans v. Lavine, 415 U.S. 528, 536–537 (1974) (federal courts lack power to entertain claims that are "so attenuated and unsubstantial as to be absolutely devoid of merit") (citation omitted)); Bell v. Hood, 327 U.S. 678, 682–683 (1946)). Indeed, the court lacks jurisdiction to entertain "fantastic or irrational allegations," which do not support any claim. Aboussa v. New Hampshire, 695 F.Supp.3d 239, 243 (D.N.H. 2023).

Here, Mr. Grant's Complaint is almost entirely premised on allegations that various federal, local, and private actors orchestrated a nearly ten-year investigation, comprised of various sting operations, electronic monitoring of Mr. Grant, and implanting devices into Mr. Grant without his consent (Claims 1–20, 32–47). For example, Mr. Grant alleges that, since 2016, he was catfished more than 80 times by more than 20 women who acted undercover and as part of law enforcement's conspiracy against him (Claims 1–6). Doc. No. 1 at ¶¶ 62, 73. He also alleges that on December 21, 2020, Defendants, who were aware and frequently took advantage of his OCD tendencies, intentionally placed a small child on the side of the road, in the middle of winter, to perpetuate the perception that Mr. Grant was a danger to children (Claims 7–14). Id. at ¶¶ 87, 90, 93–97. While at DHMC, Mr. Grant alleges that Defendants continued the conspiracy against him by placing a nurse with the same name as a women who catfished him in Boston — Coco — on his hospital floor "with the hope of antagonizing and coercing [Mr. Grant] into negative behavior"

13

(Claims 40–43), id. at ¶¶ 145–46, and by having a small black child hide under a blanket on the floor and pop up every time Mr. Grant walked by to "taunt" him, id. at ¶¶ 150–51 (Claims 44–47).

Further, as part of that conspiracy, he alleges that Defendants coordinated to implant a device into his brain while he was hospitalized at DHMC that can torture him with electronic shocks (Claims 32–39). Id. at ¶¶ 137–38. Mr. Grant also alleges that Defendants tortured and antagonized him by using a noise-emitting device that is silent to humans, but audible to dogs, and that the device was used to make his dog bark at specific times, which irritates Mr. Grant's OCD condition (Claims 15–20). Id. at ¶¶ 103, 105.

Because this court and others have consistently held that it lacks subject matter jurisdiction over "fantastic or irrational" claims like these that allege a multi-year, widespread conspiracy, the district judge should dismiss Mr. Grant's claims to the extent they are related to allegations of sting operations, catfishing, implanting devices into Mr. Grant's brain, using those implanted devices to control and torture Mr. Grant, controlling his dog through noise-emitting devices, conspiring to feed him illicit substances, or other fanciful allegations as part of the widespread conspiracy (Claims 1–20, 32–47) under Rule 12(b)(1). Aboussa, 695 F.Supp.3d at 243–44 (dismissing claims related to allegations of mind control by the government under Rule 12(b)(1)); Fisherman v. Doe Nos. 1-8, No. 22-CV-246-SE, 2023 WL 11885729, at *1 (D.N.H. Jan. 9, 2023) ("claims of satellite-based neural monitoring do not give rise to any nonfrivolous claim upon which relief can be granted"), R&R adopted, Fisherman v. Doe 1, 2023 WL 11885725 (D.N.H. Feb. 10, 2023); see, e.g., Nduka v. Williams, 410 F. Supp. 3d 719, 721 (E.D. Pa. 2019) ("Federal courts routinely dismiss allegations regarding broad-based conspiracies of computer hacking, surveillance, tracking, and the like, as factually frivolous[.]"); Denton v. Hernandez, 504 U.S. 25, 32 (1992) (on

a motion to dismiss, a court need not accept as true a plaintiff's factual allegations that describe "fantastic or delusional scenarios").

Therefore, the district judge should dismiss Claims 1–20, 32–47, all of which are intertwined with Mr. Grant's belief that the government is engaged in a multi-year conspiracy against him that involves mind control. This recommendation covers the vast majority of Mr. Grant's allegations against all Defendants.

## II.    Remaining Claims (Claims 21–31, 48–58)

Mr. Grant's remaining claims (Claims 21–31, 48–58) allege various violations of his constitutional rights and the conspiracy to violate those rights based on the following: the alleged shooting of Mr. Grant's vehicle and HPD Does' and John Doe Defendants' alleged failure to investigate (Claim 21–22); Officer Fowler falsely arresting Mr. Grant (Claims 23–25); HPD Does, LPD Does, DHMC Does, and John Doe Defendants denying Mr. Grant counsel, not informing Mr. Grant of the charges against him, and not allowing Mr. Grant the opportunity to confront witnesses during his involuntary commitment proceedings (Claims 26–27); DHMC Does, FBI Does, and John Doe Defendants neglecting Mr. Grant's OCD needs while at DHMC (Claims 28–31); HPD Does, LPD Does, DHMC Does, FBI Does, and John Doe Defendants modifying Mr. Grant's patient notes (Claims 48–51); and HPD Does, FBI Does, and John Doe Defendants modifying Mr. Grant's police records with the HPD (Claims 52–55). Mr. Grant also alleges that the Towns of Hanover and Lebanon (and their respective police departments), and DHMC Defendants enacted unconstitutional policies or customs (Claim 56) and that the Towns of Hanover and Lebanon — along with Chief Dennis, Chief Roberts, Attorney General Garland, Director Wray, and Deputy Director Abbate —failed to train their employees, which led the employees to violate Mr. Grant's constitutional rights (Claims 57–58).

15

Mr. Grant brings his claims under 42 U.S.C. §§ 1983 and 1985.[9]  Under 42 U.S.C. § 1983, "[a]ny person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected," any person "within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution" of the United States "shall be liable to the party injured . . . ."  42 U.S.C. § 1985 "prohibits two or more persons in any State or Territory from conspiring to deprive any person or class of persons of the equal protection of the laws."[10]  LeBaron v. Spencer, 527 F. App'x 25, 33 (1st Cir. 2013) (internal quotation marks and citation omitted).  Defendants move to dismiss the remaining claims for failure to state a claim under Rule 12(b)(6).

### A.  Standard of Review

To survive dismissal under Rule 12(b)(6), a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level[.]"  Id. at 545 (internal citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  In addition, "an adequate complaint must include not only a plausible claim but also a plausible

---

[9] As to the Federal Defendants, Mr. Grant brings claims against them under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), which is the "federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983."  Ashcroft v. Iqbal, 556 U.S. 662, 675–76 (2009) (internal quotation marks and citation omitted).

[10] The court construes Mr. Grant's claims as falling under § 1985(3), which allows a cause of action for the deprivation of rights or privileges. Cf. 42 U.S.C. § 1985(1)–(2) (permitting a cause of action for preventing an officer from performing duties and obstructing justice in court proceedings).

defendant." Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 594 (1st Cir. 2011). The court will address the remaining arguments in turn.

    B.  <u>Analysis</u>

        i.  *Conspiracy Claims (Claims 22, 27, 30, 50, and 54)*

Mr. Grant alleges that HPD Does, LPD Does, DHMC Does, and John Doe Defendants engaged in a conspiracy to violate his civil rights pursuant to 42 U.S.C. § 1983, and to deprive him of his rights and privileges in violation of 42 U.S.C. § 1985 (Claims 22, 27, 30, 50, and 54).[11] Defendants assert that Mr. Grant does not allege facts sufficient to plausibly assert a conspiracy claim under § 1983 or § 1985(3).[12] The court agrees.

---

[11] Mr. Grant also brings conspiracy claims against Federal Defendants (Claims 51 and 55). Because Federal Defendants move to dismiss those claims for failure to allege personal involvement against any Federal Defendant, the court will address those claims later in the Report and Recommendation. <u>See</u> infra Section II.B.v.

[12] Lebanon Defendants and DHMC Defendants move to dismiss Mr. Grant's conspiracy claims against them. Doc. No. 36-1 at pgs. 6–8; Doc. No. 40-1 at pgs. 12–15. Hanover Defendants do not move to dismiss the conspiracy claims. Generally, "[s]ua sponte dismissals are strong medicine, and should be dispensed sparingly." Chute v. Walker, 281 F.3d 314, 319 (1st Cir. 2002) (quoting Gonzalez–Gonzalez v. United States, 257 F.3d 31, 33 (1st Cir.2001)). However, "in limited circumstances, sua sponte dismissals . . . under Rule 12(b)(6) . . . are appropriate[.]" Id. (second alteration in original) (quoting Futura Dev. of P.R., Inc. v. Estado Libre Asociado de P.R., 144 F.3d 7, 13–14 (1st Cir.1998)). Those circumstances include when "parties have been afforded notice and an opportunity to amend the complaint or otherwise respond[,]" or when "it is crystal clear that the plaintiff cannot prevail and that amending the complaint would be futile[.]" Id. (internal quotation marks and citations omitted). Here, although Hanover Defendants did not move to dismiss the conspiracy claims under § 1983 or § 1985(3), Mr. Grant was on notice of Lebanon Defendants' and DHMC Defendants' arguments that he did not sufficiently allege facts to state a conspiracy claim under § 1983 or § 1985(3) and had the opportunity to, but failed to successfully, object to those arguments. See Doc. Nos. 56 at ¶¶ 8–9, 59 at ¶ 7 (concluding, without any legal support, that Mr. Grant can recover under § 1983 or § 1985). But, even with the opportunity to object, it is clear that Mr. Grant cannot state a conspiracy claim under § 1983 or § 1985(3) because he lacks any allegation of an agreement or class-based, discriminatory animus. Therefore, the court recommends dismissal of all remaining conspiracy claims as to Lebanon, DHMC, and Hanover Defendants (Claims 22, 27, 30, 50, and 54).

"A civil rights conspiracy . . . is a combination of two or more persons acting in concert to commit an unlawful act . . . the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another."  LeBaron, 527 F. App'x at 33 (second alteration in original).  "In order to make out an actionable conspiracy under section 1983, a plaintiff has to prove not only a conspiratorial agreement but also an actual abridgment of some federally-secured right."  Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001).

Similarly, "[p]leading a section 1985(3) conspiracy 'requires at least minimum factual support of the existence of a conspiracy.'"  Parker v. Landry, 935 F.3d 9, 18 (1st Cir. 2019) (quoting Francis-Sobel v. Univ. of Me., 597 F.2d 15, 17 (1st Cir. 1979)).  "However, a claim of conspiracy to deprive a plaintiff of civil rights will not survive a motion to dismiss if it makes conclusory allegations without making supporting factual assertions."  Jellyman v. City of Worcester, 354 F. Supp. 3d 95, 100 (D. Mass. 2019) (internal quotation marks and citation omitted).

Here, the Complaint is completely devoid of any facts that demonstrate an agreement between any of Defendants.  There is no direct evidence of an agreement, nor does Mr. Grant assert factual allegations sufficient to support a reasonable inference that such an agreement was made. Instead, Mr. Grant broadly claims that HPD Does, LPD Does, DHMC Does, and John Doe Defendants "acted in conspiracy and with agreement, permission, ratification, and approval of their joint conduct" with other Defendants to violate his constitutional rights.  See, e.g., Doc. No. 1 at ¶¶ 194, 339.

"Vague and conclusory allegations about persons working together, with scant specifics as to the nature of their joint effort or the formation of their agreement, will not suffice to defeat a motion to dismiss."  Alston v. Spiegel, 988 F.3d 564, 578 (1st Cir. 2021); see Diaz v. Devlin, 229

F.Supp.3d 101, 111 (D. Mass. 2017) ("[A] claim of conspiracy to deprive a plaintiff of civil rights will not survive a motion to dismiss if it makes conclusory allegations without making supporting factual assertions.").  Without more specific allegations as to how HPD Does, LPD Does, DHMC Does, and John Doe Defendants came to an agreement to inflict wrong against Mr. Grant and what that agreement entailed, Mr. Grant's "bare assertions" fail to state a conspiracy claim under § 1983 or § 1985(3).  Hudson v. MacEachern, 94 F. Supp. 3d 59, 70 (D. Mass. 2015) (dismissing § 1983 or § 1985 conspiracy claims because bald assertions of agreement to violate plaintiff's rights was insufficient to state a claim).

Further, with respect to Mr. Grant's § 1985(3) conspiracy claims, dismissal is appropriate for the additional reason that Mr. Grant fails to allege that the relevant Defendants acted with a conspiratorial purpose that was propelled by a class-based animus.  Stand With US Ctr. for Legal Just. v. Massachusetts Inst. of Tech., 158 F.4th 1, 24 (1st Cir. 2025) (under § 1985(3), "a plaintiff may recover only when the conspiratorial conduct of which he complains is propelled by some racial, or perhaps otherwise class-based, invidiously discriminatory animus" (internal quotation marks and citation omitted)).  Instead, Mr. Grant alleges that he was specifically targeted even though he had done nothing wrong.  See, e.g., Doc. No. 1 at ¶ 11.  By failing to allege a conspiratorial purpose, Mr. Grant failed to state a plausible claim under § 1985(3).

Accordingly, for all these reasons, the district judge should dismiss the remaining conspiracy claims (Claims 22, 27, 30, 50, and 54).

ii. *DHMC Defendants (Claims 26, 28, 48 and 56)*

DHMC Defendants assert that Mr. Grant's § 1983 claims against them (Claims 26, 28, 48, and 56) should be dismissed because DHMC Defendants, including DHMC as a hospital and DHMC Does, are private parties and not "state actors." Doc. No. 40-1 at pgs. 8–12.  To state a

19

claim pursuant to § 1983, a plaintiff must establish "that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).  If a § 1983 claim is asserted against a private party, "the plaintiff must establish that 'the alleged infringement of federal rights [was] fairly attributable to the State[.]'" Peters v. Applewood Care & Rehab. Ctr., No. 12-CV-233-PB, 2012 WL 3777438, at *2 (D.N.H. Aug. 30, 2012) (alterations in original) (quoting Rendell–Baker v. Kohn, 457 U.S. 830, 838 (1982)).

Mr. Grant does not assert that DHMC Defendants are state actors but rather claims that DHMC Defendants exercised "state-granted authority and/or . . . [acted] under the authority of the court." Doc. No. 56 at ¶ 6.  DHMC maintains that it is a private actor, and therefore, § 1983 is not applicable. American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50–51 (1999) ("[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct[.]" (internal quotation marks and citation omitted)).

This court has already concluded that private hospitals "should not become a state actor for purposes of § 1983 liability merely by invoking or acting in accordance with, or by failing to invoke or act in accordance with" New Hampshire's involuntary emergency hospitalization statute "when exercising professional judgment or delivering professional services related to the involuntary hospitalization of persons in need of mental health care." Trimble v. Androscoggin Valley Hosp., Inc., 847 F. Supp. 226, 229 (D.N.H. 1994).  Other courts have come to the same conclusion and found hospitals "are generally not proper § 1983 defendants because they do not act under color of state law." White v. St. Joseph's Hosp., 369 F. App'x 225, 226 (2d Cir. 2010); see, e.g., Rockwell v. Cape Cod Hosp., 26 F.3d 254, 257 (1st Cir. 1994) (private hospital and physicians were not a proper party under § 1983).

20

The court sees no reason, and Mr. Grant does not provide any reason, to reject this case law. DHMC, to the extent it was operating under New Hampshire's involuntary hospitalization statute, is a private hospital and cannot be said to have acted under the color of state law. Moreover, to the extent DHMC was not acting pursuant to any statutory scheme, its "actions could only be entirely private, not 'fairly attributable to the state,' and thus incapable of satisfying the 'under color of state law' element of a section 1983 claim." Trimble, 847 F. Supp. at 230 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

Nevertheless, Mr. Grant contends that he alleges sufficient "facts and circumstances" to establish that DHMC exercised "state-granted authority." Doc. No. 56 at ¶ 7. In support of his argument, Mr. Grant cites Kirtley v. Rainey, a Ninth Circuit case that sets out four criteria that the Ninth Circuit has applied to determine where state action may be found. Doc. No. 56 at ¶¶ 6–7 (citing Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003), which employs the following four tests to determine § 1983 liability for a private actor: public function, joint action, governmental compulsion or coercion, and governmental nexus). However, Mr. Grant includes no analysis in his motion regarding the application of the Ninth Circuit tests. See id. at ¶ 7 (concluding without any analysis that "Mr. Grant alleges facts and circumstances regarding and surrounding DH[M]C Defendants' actions that satisfy (1), (2), (3), and/or (4) of [the Ninth Circuit] test[s.]"). Further, he does not explain why this court should disregard the persuasive authority discussed above or why the court should not apply the three tests used by the First Circuit. See Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 5 (1st Cir. 2005) (using three tests to determine § 1983 liability for a private actor: the state compulsion test, the nexus/joint action test, and the public function test). Thus, the court declines to apply the Ninth Circuit tests under these circumstances.

Yet, even when the court applies the facts of this case regarding DHMC to the three tests used by the First Circuit — the state compulsion test, the nexus/joint action test, and the public function test — DHMC is not a "state actor" under § 1983.  Id.

State compulsion

"Under the state compulsion test, a private party is fairly characterized as a state actor when the state 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State.'"  Id. (alteration in original) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)).  Mr. Grant alleges no facts that support the conclusion that the state compelled or significantly encouraged DHMC Defendants to conduct the activities that he claims violate his constitutional rights, including denying him the right to effective assistance of counsel at his involuntary commitment hearing, failing to meet his OCD needs, retroactively modifying his hospital records, and creating unconstitutional policies or customs.  Doc. No. 1 at ¶¶ 332, 339, 344, 356, 471, 484.  Instead, Mr. Grant alleges that DMHC Defendants "acted in concert" with other Defendants based on their mutual "meeting of the minds[.]"  See, e.g., id. at ¶ 337.  Without evidence that DHMC Defendants were coerced into violating Mr. Grant's rights, Mr. Grant has not satisfied the state compulsion test.

Nexus/joint action

The nexus/joint action test is satisfied "where an examination of the totality of the circumstances reveals that the state has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity].'"  Estades-Negroni, 412 F.3d at 5 (alterations in original) (quoting Bass v. Parkwood Hosp., 180 F.3d 234, 242 (5th Cir.1999)).  As stated above, Mr. Grant claims that DHMC Defendants worked "in

22

concert" with other Defendants to violate his constitutional rights. Doc. No. 1 at ¶ 337. However, "working together is not enough." Scott v. Univ. of Chicago Med. Ctr., 107 F.4th 752, 761 (7th Cir. 2024) (internal quotation marks omitted). "[T]here is state action only when public and private entities are interdependent to the point of largely overlapping identity." Id. (internal quotation marks and citation omitted). Mr. Grant alleges no facts that demonstrate that DHMC Defendants were sufficiently entwined with the State. See, e.g., Estades-Negroni, 412 F.3d at 6 (allegations that "state statutes provide the mechanism for involuntary commitment; the state extensively regulates such commitment; [the hospital and several of its physicians] received money derived from the state; and [the hospital and several of its physicians] sought court authorization for [plaintiff's] commitment" were insufficient to show private hospital and several of its physicians were state actors under the nexus/joint action test). Accordingly, Mr. Grant has not shown DHMC Defendants are state actors under the joint nexus test.

### Public function

Finally, the public function test is satisfied where "the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been 'traditionally the exclusive prerogative of the State.'" Id. at 5 (quoting Blum, 457 U.S. at 1005). "Exclusivity is an important qualifier, and its presence severely limits the range of eligible activities." Santiago v. Puerto Rico, 655 F.3d 61, 69 (1st Cir. 2011). "[T]he activities that have been held to fall within the state's exclusive preserve for purposes of the public function test are few and far between[,]" id., and include "the administration of elections, the operation of a company town, eminent domain, peremptory challenges in jury selection, and, in at least limited circumstances, the operation of a municipal park." Perkins v. Londonderry Basketball Club, 196 F.3d 13, 19 (1st Cir. 1999) (internal quotation marks and citation omitted).

23

Construing Mr. Grant's Complaint liberally, he alleges that DHMC Defendants engaged in an investigation of him over a number of years and participated in his involuntary commitment. Doc. No. 1 at ¶¶ 1–2, 127. However, neither of those actions fall within the State's exclusive preserve. See Estades-Negroni, 412 F.3d at 8 (collecting cases supporting the proposition that "involuntary commitment is a function that is and has been routinely performed by private parties"); see, e.g., United States v. Miller, 982 F.3d 412, 423 (6th Cir. 2020) (investigations have "long been performed by private parties protecting their property"); Arias v. City of Everett, No. CV 19-10537-JGD, 2019 WL 6528894, at *9 (D. Mass. Dec. 4, 2019) ("asset protection" on behalf of Home Depot that may have assisted police in an investigation and prosecution does not satisfy public function test). The fact that DMHC Defendants may perform functions that serve the public as a hospital "does not make its acts state action." Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982). Accordingly, Mr. Grant has not pled facts that would show the public function test is satisfied as to DHMC Defendants.

For all these reasons, DHMC Defendants are not state actors and cannot be liable under § 1983 for Mr. Grant's alleged constitutional violations. West, 487 U.S. at 48. Therefore, the district judge should dismiss the remaining § 1983 claims against DHMC Defendants (Claims 26, 28, 48, and 56).

iii. *Municipal Liability as to Town of Hanover and Town of Lebanon (Claims 56 and 57)*

Mr. Grant alleges that the Towns of Hanover and Lebanon, and their respective police departments,[13] are liable under § 1983 for enacting policies or customs that allow violations of the

---

[13] To the extent Mr. Grant seeks to bring Claim 56 against the HPD and LPD as separate entities, Mr. Grant cannot succeed on that claim because, as Hanover Defendants assert, is "[a] municipal police department [that] is not an entity subject to suit under § 1983." Brady v. Whitefield Police Dep't, No. 19-CV-00147-JL, 2019 WL 2720783, at *2 (D.N.H. June 13, 2019) (citing Henschel

First, Fourth, Sixth, Eighth, and Fourteenth Amendments (Claim 56).[14]  Mr. Grant further alleges

that the Towns of Hanover and Lebanon failed to train, supervise, discipline, or correct officers,

which led to violations of his constitutional rights (Claim 57).

      "Municipalities cannot be held liable for the conduct of their employees unless the

municipality itself is also responsible in some way for that conduct."  Lavigne v. Great Salt Bay

Cmty. Sch. Bd., 146 F.4th 115, 123 (1st Cir. 2025) (citing Monell v. Dep't of Soc. Servs., 436 U.S.

658 (1978)).  "Indeed, it is only when the governmental employees' execution of a government's

policy or custom . . . inflicts the injury and is the moving force behind the constitutional violation

that a municipality can be liable."  Id. (alteration in original) (internal quotation marks omitted)

(quoting Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25 (1st Cir. 2005)); Monell,

436 U.S. at 694.  "Thus, the two basic elements" of municipal liability claims pursuant to § 1983

are (1) whether Mr. Grant's "harm was caused by a constitutional violation;" and (2) "whether the

municipal entity, in this case the [Town], can be held responsible for that violation."  Lavigne, 146

F.4th at 123 (internal quotation marks and citation omitted).  If a plaintiff fails to establish one

element, "there can be no municipal liability."  Id. at 123–24 (trial court did not err when it only

analyzed the second element of municipal liability).

---

v. Worcester Police Dep't., 445 F.2d 624 (1st Cir. 1971)) ("If a Police Department may be successfully sued, it is the city which will pay; the result is the same as suing the city[.]"), R&R adopted, 2019 WL 2716320 (D.N.H. June 27, 2019); see Salem v. Stoneham Police Dep't, 752 F. Supp. 3d 282, 290 (D. Mass. 2024).

[14] Mr. Grant also brings Claim 56 against DHMC.  Because the court recommends dismissal against DHMC as it is not a state actor, the court need not address whether DHMC is liable for creating unconstitutional policies.  Scott, 107 F.4th at 761 (liability only applies to municipalities acting under color state law).

Mr. Grant alleges two separate Monell claims — an unconstitutional policy or custom claim and a failure-to-train claim — each which require different kinds of proof. Haley v. City of Bos., 657 F.3d 39, 51 (1st Cir. 2011).[15]  However, the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385 (1989); Burns v. City of Worcester, 772 F. Supp. 3d 109, 139 (D. Mass. 2025) ("Regardless of whether plaintiff's theory is grounded upon municipal policy, practice, or custom, it 'must be so tied to the challenged acts that it can be said to be the moving force of the constitutional violation.'" (quoting Freeman v. Town of Hudson, 849 F. Supp. 2d 138, 149 (D. Mass. 2012))).

As Defendants assert, Mr. Grant failed to allege facts to show a direct causal link between the Towns' policies or customs and Mr. Grant's alleged constitutional deprivations. See Doc. No. 36-1 at pg. 13; Doc. No. 37-1 at pg. 6.[16]  Rather, he generally alleges that Hanover and Lebanon enacted de facto policies, customs, and/or practices of: "harassing, intimidating, and threatening to arrest and arresting persons who exercise their First Amendment rights of freedom of

---

[15] "Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies." Haley, 657 F.3d at 52.  By comparison, proving municipal liability for enacting an unconstitutional policy requires that a plaintiff show that the municipality "was the moving force behind the injury alleged" and "identify a municipal policy or custom that caused the plaintiff's injury." Id. at 51 (internal quotation marks and citations omitted).

[16] Hanover Defendants do not separately move to dismiss Mr. Grant's failure-to-train claim. See Doc. No. 37-1.  However, Hanover Defendants' argument is based on the first inquiry in a Monell claim — whether there is a direct causal link between a municipal policy or custom and plaintiff's alleged constitutional deprivation — and Mr. Grant had an opportunity to address that claim. Doc. No. 45; Harris, 489 U.S. at 385.  Accordingly, the court can, and should, dismiss Mr. Grant's municipal liability claims against the Town of Hanover (Claims 56 and 57). See Chute, 281 F.3d at 319.

expression;" engaging in unreasonable searches and seizures in violation of the Fourth Amendment; denying individuals of their right to counsel, to be informed of charges against them, and the right to confront witnesses, in violation of the Sixth Amendment; using cruel and unusual punishment, in violation of the Eighth Amendment; and maliciously prosecuting and violating due process rights, in violation of the Fourteenth Amendment. Doc. No. 1 at ¶ 523(i)–(v). He also claims that Hanover and Lebanon enacted policies that led to or allowed the improper training of employees. Id. at ¶ 532.

Although Mr. Grant's allegations may state the correct elements of a municipal liability claim — that Hanover and Lebanon enacted policies or customs and that those policies or customs were the driving force of constitutional violations — he fails to provide factual allegations that demonstrate what policies the Town enacted, when they were enacted, or how that were enforced. Id. at ¶¶ 523–24, 532–33. In other words, "[t]o state there is a policy does not make it so." Corley v. Vance, 365 F. Supp. 3d 407, 450 (S.D.N.Y. 2019) (internal quotation marks and citation omitted), aff'd sub nom. Corley v. Wittner, 811 F. App'x 62 (2d Cir. 2020); see Winfield v. Town of Andover, 305 F. Supp. 3d 286, 297 (D. Mass. 2018) (plaintiff did not sufficiently plead facts to state a municipal liability claim where the plaintiff only alleged that the town "[a]uthorized the use of force in violation of constitutional rights; . . . [o]verlooked and permitted repeat violations of the First and Fourth Amendments;" failed to train, discipline, train, or discharge officers who engaged in a pattern of unconstitutional behavior; and tolerated discriminatory policing).

Without specific allegations as to what the Town enacted or adopted and how its policies or customs were directly linked to Mr. Grant's constitutional rights, Mr. Grant has not sufficiently stated a claim for municipal liability against Hanover and Lebanon. Cf. Haley, 657 F.3d at 52 (plaintiff sufficiently alleged facts to state a municipal liability claim against the City of Boston

27

where he stated that detectives at the Boston Police Department withheld exculpatory statements pursuant to a standing policy, which "regularly kept helpful evidence from criminal defendants" and "was designed to encourage successful prosecutorial outcomes despite the existence of evidence pointing to innocence"); Off. of Pub. Guardian v. Elliot Hosp., 626 F. Supp. 3d 520, 534 (D.N.H. 2022) (plaintiff's municipality liability claim survived where plaintiff "alleged that the failure to provide medical care resulted, in part, from the County's failure to refer [the victim] to medical providers and adequately train its employees on how to treat inmates suffering from mental illness").

Accordingly, the district judge should dismiss Claims 56 and 57 against the Towns of Hanover and Lebanon.

iv. *Claims against Individual Defendants in their Official and Individual Capacities* (Claims 23–25, 57, and 58)

In his Complaint, Mr. Grant asserts various claims against individual law enforcement officers in both their individual and official capacities. See Doc. No. 1 at ¶¶ 39–41, 43–45. In Claims 23–25, Mr. Grant alleges that Officer Fowler, in his individual and official capacities, violated his First, Fourth, and Fourteenth Amendment rights by falsely arresting Mr. Grant. Id. at ¶¶ 312, 318–21, 327. In Claim 57, Mr. Grant alleges that Chief Dennis and Chief Roberts, in their individual and official capacities, knew about, but failed to train, supervise, or discipline officers who violated constitutional rights. Id. at ¶ 532. Finally, in Claim 58, Mr. Grant alleges Attorney General Garland, Director Wray, and Deputy Director Abbate, in their individual capacities, failed to train, supervise, or discipline FBI Doe employees who violated Mr. Grant's constitutional rights. Id. at ¶ 540.

Defendants move to dismiss those claims against them in full. Officer Fowler, however, moves to dismiss only the official-capacity claims against him. See Doc. No. 38 at pg. 1; Doc. Nos. 36, 37, 42.

Official Capacity Claims against Chief Dennis,<br>Chief Roberts, and Officer Fowler (Claims 23–25, 57)

"An official-capacity suit is 'in all respects other than name, to be treated as a suit against the entity.'" Signs for Jesus v. Town of Pembroke, No. 15-cv-482-PB, 2016 WL 1171016, at *2 (D.N.H. Mar. 24, 2016) (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985)); see also Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005); Wood v. Hancock Cnty. Sheriff's Dep't, 354 F.3d 57, 58 n.1 (1st Cir. 2003); Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir. 1993). Under Monell, "local government units can be sued directly for damages and injunctive or declaratory relief." Graham, 473 U.S. at 167 n.14. Accordingly, "[t]here is no . . . need to bring official-capacity actions against local government officials . . . ." Id.; see Traudt v. Lebanon Police Dep't, 749 F. Supp. 3d 251, 258 (D.N.H. 2024). Mr. Grant does not dispute this unbroken line of cases. See generally Doc. Nos. 45, 59.

With respect to the official-capacity claims against Chief Dennis and Chief Roberts (Claim 57), Mr. Grant also names the Town of Hanover and the Town of Lebanon in that claim. Therefore, his official-capacity claim against Chief Dennis and Chief Roberts is unnecessarily duplicative of his claim against the Towns and should be dismissed on that basis.[17]

---

[17] Hanover Defendants explicitly move to dismiss the official-capacity claim against Chief Dennis, Doc. No. 37-1 at pgs. 3–4, whereas Lebanon Defendants move to dismiss the claim against Chief Roberts for failure to "articulate what policies were enacted, when they were enacted, and how they were enforced." Doc. No. 36-1 at pg. 13. In other words, Lebanon Defendants notified Mr. Grant that they were moving to dismiss the Monell claim against Chief Roberts for the same reasons asserted as to the Town of Lebanon. Because a claim against an officer in their official capacity is the same as a claim against the municipality, and because Mr. Grant had notice of Lebanon Defendants' arguments as to dismissal of the claim against Chief Roberts, the district

The official-capacity claims against Officer Fowler (Claims 23–25) should likewise be dismissed. Although Mr. Grant does not name the Town of Hanover as a defendant in those same claims, his official-capacity claims against Officer Fowler are nevertheless duplicative of his claims against the Town. Cf. Traudt, 749 F. Supp. 3d at 258 (dismissing official-capacity claims because plaintiff also named the City as a defendant in those claims and, therefore, the claims were "indistinguishable"). Mr. Grant alleges that Officer Fowler falsely arrested Mr. Grant in violation of his First Amendment rights; unlawfully searched, seized, and used excessive force in violation of his Fourth Amendment rights; and violated his equal protection and substantive due process rights under the Fourteenth Amendment by falsely arresting Mr. Grant. Doc. No. 1 at ¶¶ 309–28. "[I]n an official-capacity suit[,] the entity's policy or custom must have played a part in the violation of federal law." Graham, 473 U.S. at 166 (internal quotation marks and citation omitted). In other words, Mr. Grant's official-capacity claims against Officer Fowler are claims that the entity that employs him — the Town of Hanover — has an official policy or custom that played a part in violating Mr. Grant's constitutional rights. But, for the reasons stated above with respect to Claims 56 and 57 against the Town of Hanover, Mr. Grant failed to allege that the Town of Hanover had an official policy or custom that caused Mr. Grant's alleged constitutional violations. see Ward v. Town of Enfield, No. 3:15-CV-1313-(AVC), 2016 WL 11804190, at *4 (D. Conn. Mar. 16, 2016) (dismissing official-capacity claims against an officer because it was duplicative of a separate, "overarching claim against the Town"). Therefore, Officer Fowler is not liable to Mr. Grant in his official capacity.

---

judge can and should dismiss the official-capacity claim against Chief Roberts (Claim 57). See Chute, 281 F.3d at 319.

For the reasons stated, the district judge should dismiss the official-capacity claims against Chief Dennis, Chief Roberts, and Officer Fowler[18] (Claims 23–25, 57).

<u>Individual-capacity claims against Chief Dennis,</u>
<u>Chief Roberts, Garland, Wray, and Abbate (Claims 57 and 58)</u>

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*, [but] supervisory officials may be liable on the basis of their own acts or omissions.  Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009) (internal quotation marks and citations omitted).

> In the context of Section 1983 actions, supervisory liability typically arises in one of two ways: either the supervisor may be a "primary violator or direct participant in the rights-violating incident," or liability may attach "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation."

Id. (quoting Camilo–Robles v. Zapata, 175 F.3d 41, 44 (1st Cir.1999)). "In either case, the plaintiff in a Section 1983 action must show an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization, between the actor and the underlying violation."  Id. (quoting Camilo–Robles, 175 F.3d at 44)).

Here, Mr. Grant's claim against Chief Dennis and Chief Roberts (Claim 57), as well as his claim against Garland, Wray, and Abbate (Claim 58) are based "solely on [their] position[s] of authority."[19]  Guadalupe-Baez v. Pesquera, 819 F.3d 509, 515 (1st Cir. 2016).  Mr. Grant's

---

[18] Because Officer Fowler moved to dismiss only the official capacity claims brought against him, see Doc. No. 38, the district judge should not dismiss the portions of Claims 23–25 that allege Officer Fowler, in his individual capacity, violated Mr. Grant's constitutional rights.

[19] With respect to Mr. Grant's <u>Bivens</u> claim against Garland, Wray, and Abbate, the standard for proving supervisory liability is the same as under § 1983 and a plaintiff must show that the "supervisor's action or inaction was affirmatively linked to the constitutional violation caused by the subordinate."  Ruiz Rivera v. Riley, 209 F.3d 24, 28–29 (1st Cir. 2000) (internal quotation marks and citation omitted); Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005) (a

Complaint is silent as to any affirmative link between those Defendants and Mr. Grant's alleged constitutional violations. Without additional factual allegations that establish "an affirmative link between the behavior of a subordinate and the action or inaction of his supervisor . . . such that the supervisor's conduct led inexorably to the constitutional violation[,]" Mr. Grant has not plausibly alleged an individual-capacity claim against Chief Dennis, Chief Roberts, Garland, Wray, or Abbate. Morales v. Chadbourne, 793 F.3d 208, 221 (1st Cir. 2015) (quoting Maldonado v. Fontanes, 568 F.3d 263, 275 (1st Cir. 2009), which concluded that mayor's promulgation of policy that led to killing of pets and presence at raid where pets were collected was insufficient to show affirmative link necessary for supervisor liability)); Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 534 (1st Cir. 2011) (collecting cases that concluded broad allegations against high-ranking officials were insufficient to state a claim of supervisor liability); see, e.g., Soto-Torres, 654 F.3d at 159 ("[I]t is not enough to state that a defendant was the officer in charge during the incident and that he participated in or directed the constitutional violations alleged [in the Bivens action]." (internal quotation marks omitted)).

Accordingly, the district judge should dismiss the individual-capacity claims against Chief Dennis, Chief Roberts (Claim 57), Garland, Wray, and Abbate (Claim 58).[20]

---

supervisory claim is viable under Bivens if liability is premised on the supervisor's "own acts or omissions" and must constitute "supervisory encouragement, condonation, or acquiescence or gross negligence . . . amounting to deliberate indifference" (alteration in original) (internal quotation marks and citations omitted)). Mr. Grant asserts no facts linking the alleged constitutional violations cause by the unnamed FBI Doe Defendants to any action or inaction of Garland, Wray, or Abbate.

[20] Federal Defendants move to dismiss Claim 58 against Garland, Wray, and Abbate on other grounds, including that the court lacks personal jurisdiction over them, they are entitled to qualified immunity, and Bivens does not apply in this context. Doc. No. 42-1 at pgs. 10–18. Although, for the reasons stated in Federal Defendants' Motion to Dismiss, the court agrees that those arguments would succeed on their own, the court does not address those separate arguments because Mr.

v. *Doe Defendants (Claims 21, 26, 29, 31, 48, 49, 51–53, 55)*

The remaining § 1983 claims are against various "Doe Defendants" who are made up of unnamed employees of the Town of Hanover, the Town of Lebanon, the FBI, and John Doe Defendants (Claims 21, 26, 29, 31, 48, 49, 51–53, 55).  To state a claim under § 1983, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676.  In other words, "[e]ach defendant must have personally participated in, encouraged, condoned, or acquiesced in rights-violating conduct." Remus-Milan v. Irizarry-Pagan, 81 F. Supp. 3d 174, 178 (D.P.R. 2015); Pineda v. Hamilton Cnty., Ohio, 977 F.3d 483, 490 (6th Cir. 2020) ("Each defendant must be personally involved in the unconstitutional action." (internal quotation marks and citation omitted)).

Although Mr. Grant's Complaint is 104 pages in length and contains numerous allegations against these Doe Defendants, his claims are too broad to survive a motion to dismiss under Rule 12(b)(6).  As Defendants assert, Mr. Grant "lump[s]" together multiple defendants rather than clearly stating "which defendant or defendants committed each of the alleged wrongful acts[,]" as he is required to do in order to state a claim.[21]  Canales v. Gatzunis, 979 F. Supp. 2d 164, 170 (D. Mass. 2013) (quoting Bagheri v. Galligan, 160 F. App'x 4, 5 (1st Cir. 2005)).  For instance, Mr.

---

Grant has not stated a claim against Garland, Wray, and Abbate, as explained in this Report and Recommendation.

[21] Hanover Defendants moved to dismiss claims against HPD, but do not separately move to dismiss the claims against HPD Does.  See Doc. No. 37-1.  However, the district judge can and should dismiss the remaining claims against HPD Does because Mr. Grant had notice that he failed to allege personal involvement as to his Doe Defendants through the Lebanon Defendants' and Federal Defendants' motions to dismiss and had an opportunity, but failed, to meaningfully object to those arguments.  See generally Doc. Nos. 58, 59; Chute, 281 F.3d at 319.  Further, Mr. Grant's claims against Doe Defendants clearly lack merit in that he does not narrow his group of Defendants to a discrete group of individuals who, if identified, could be personally liable to Mr. Grant. Id.

Grant alleges that all or some of the Doe Defendants, along with other Defendants from other municipalities and entities, conspired to: not investigate the shooting of Mr. Grant's windshield on the highway, deny his Sixth Amendment right to counsel, deny Mr. Grant's OCD needs while at DHMC, and retroactively modify Mr. Grant's patient notes and HPD police record. Doc. No. 1 at ¶¶ 299, 332, 339, 349, 363, 471, 477, 484, 491, 503, 517. The only involvement alleged on behalf of the HPD, LPD, or FBI Does is that they are employees of their respective entities. Id. at ¶¶ 1, 47, 48. As to the John Doe Defendants, Mr. Grant fails to allege any personal involvement, and instead states that even though he does not know their "identities, capacities, and/or nature of involvement[,]" he "believes . . . there is likely to be evidentiary support to prove that each Doe Defendant was involved in some manner and legally responsible for the acts, omissions and/or breaches of duty alleged" in his lawsuit. Id. at ¶ 50.

Mr. Grant's conclusory allegations are not sufficient to show that the Doe Defendants were personally involved in the alleged violations of his constitutional rights such that they should be liable for those violations. See Langford v. Joyner, 62 F.4th 122, 125 (4th Cir. Mar. 2, 2023) (plaintiff's complaint against federal officials failed to meet plausibility standard when it did not state facts to show who the defendants were beyond being employees where he was incarcerated or in what capacity the defendants interacted with the plaintiff); see, e.g., Donahue v. Wellpath Corp., No. 4:24-CV-00513, 2024 WL 1890378, at *2 (M.D. Pa. Apr. 30, 2024) (plaintiff's complaint alleging that "[a]ll named Defendants violated his Eighth Amendment rights by generally delaying treatment, denying treatment, denying requests for treatment, and denying treatment for nonmedical reasons" was insufficient to show defendants' personal involvement in constitutional violation (alteration in original) (internal quotation marks omitted)).

Although "courts often permit claims against John Doe defendants to proceed to discovery," particularly where "plaintiff's inability to identify which defendants committed which specific acts is due in part to defendants' alleged misconduct," Mr. Grant's Complaint is still deficient in that it has not identified a discrete group of individuals that were personally liable for his alleged constitutional violations. Echavarria v. Roach, No. 16-CV-11118-ADB, 2017 WL 3928270, at *4 (D. Mass. Sept. 7, 2017) (collecting cases); cf. Cuadrado v. Wall, No. CA 08-305 ML, 2010 WL 1499589, at *2 (D.R.I. Mar. 9, 2010) (plaintiff's allegations that five officers assaulted and attacked him was sufficient to state a constitutional violation because claims gave defendants fair notice of the claims against them), R&R adopted, 2010 WL 1372700 (D.R.I. Apr. 5, 2010). As currently written, Mr. Grant's Complaint names a broad group of Defendants and the court cannot "draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Iqbal, 556 U.S. at 678).

Accordingly, the district judge should dismiss Claims 21, 26, 29, 31, 48, 49, 51–53, 55 for failure to state a claim against the Doe Defendants.[22]

### III.   **Preliminary Injunction**

Mr. Grant also requests that the court enjoin Defendants from using the medical device implanted in his brain to antagonize, coerce, and torture him, Doc. No. 5 at pg. 8, and from engaging in an ongoing criminal investigation against him. Doc. No. 6 at pg. 9. "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council,

---

[22] The Lebanon Defendants also move to dismiss claims against the LPD Does for failure to allege violations under the Sixth and Fourteenth Amendment. Doc. No. 36-1 at pgs. 8–11. Because the court recommends dismissal for failure to allege personal involvement, the court will not address whether Mr. Grant alleged a constitutional violation.

555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the moving party must show: "(1) a likelihood of success on the merits;" (2) a likelihood of irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in the movant's favor; and (4) that the injunction would serve the public interest. Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015). "Irreparable harm and likelihood of success are the factors that weigh most heavily in the analysis." Thomas v. Warden, Fed. Corr. Inst., Berlin, N.H., 596 F. Supp. 3d 331, 336 (D.N.H. 2022).

For the reasons stated above in the context of Defendants' motion to dismiss, the court lacks jurisdiction of Mr. Grant's irrational allegations that Defendants implanted a medical device into his brain and the allegations that Defendants conducted a criminal investigation that involved a multi-year sting operation, which included, among other things, catfishing Mr. Grant, harassing his dog, and using children to set him up. Accordingly, Mr. Grant has not demonstrated a likelihood of success on the merits of his claims. For that reason, the district judge should deny Mr. Grant's motions for preliminary injunction (Doc. Nos. 5, 6).

## CONCLUSION

For the reasons stated above, the district judge should grant each of Defendants' motions to dismiss (Doc. Nos. 36, 37, 38, 40, 42) and dismiss:

- Claims 1–20, 32–47 for lack of subject matter jurisdiction under Rule 12(b)(1);

- Claims 21, 22, 26–31, 48–58 for failure to state a claim under Rule 12(b)(6); and

- Dismiss the portions of Claims 23–25 that seek to hold Officer Fowler liable in his official capacity.

If the district judge adopts this Report and Recommendation, Claims 23–25 against Officer Fowler in his individual capacity, would be the only remaining claims in this lawsuit.

The district judge should also deny Mr. Grant's motions for preliminary injunction (Doc. Nos. 5, 6).

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  The fourteen-day period may be extended upon motion.  Only those issues raised in the objection to this Report and Recommendation are subject to review in the district court.  See Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010).  Any issues not preserved by such objection(s) are precluded on appeal. See id.  Failure to file any objections within the specified time waives the right to appeal the district court's order.  See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).

_____
Talesha L. Saint-Marc
U.S. Magistrate Judge

February 24, 2026

cc:    Tyler Yewell Grant, pro se
       Counsel of Record